**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Daniel Charles Feldman,

Plaintiff,

v.

Commissioner of Social Security Administration,

Defendant.

No. CV 25-02660 PHX JJT (CDB)

**REPORT AND RECOMMENDATION**

**TO THE HONORABLE JOHN J. TUCHI:**

This case was referred to the Magistrate Judge for preparation of a report and recommendation in accordance with the provisions of Rules 72.1 and 72.2(a)(10) of the Local Rules of Civil Procedure for the District of Arizona.[1]

**I. Procedural Background**

On or about January 16, 2023, Plaintiff (through counsel) filed an applications for Social Security disability insurance benefits, pursuant to Title II, and Supplemental Security Income ("SSI") benefits, pursuant to Title XVI. (ECF No. 9-6 at 2-12, 15-18, 21-24). Plaintiff alleged he became unable to work beginning November 17, 2022 (ECF No. 9-6 at 3, 21), due to ulcerative colitis, diverticulitis, and hypertension. (ECF No. 9-7 at 2, 10). Plaintiff's claims were denied initially on October 19, 2023 (ECF No. 9-4 at 2), and on reconsideration on November 28, 2023 (ECF No. 9-4 at 22).

[1] Plaintiff was initially represented by counsel, who withdrew on December 5, 2025, in compliance with an order issued by District Judge Bolton on November 3, 2025 (ECF No. 14-1), after docketing an opening brief (ECF No. 10). Thereafter Plaintiff has proceeded pro se and he did not file a reply brief.

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was conducted May 30, 2024. (ECF No. 9-3 at 44-63). Plaintiff was represented by counsel at the hearing. (*Id.*). In an order entered July 29, 2024, the ALJ determined Plaintiff was not disabled. (ECF No. 9-3 at 27-43). Plaintiff sought review of the ALJ's decision by the Social Security Appeals Council, which affirmed the ALJ's decision on May 30, 2025 (ECF No. 9-3 at 2-4), making the ALJ's decision the final, appealable decision of the Commissioner.

**II. Governing Law**

Plaintiff seeks disability benefits pursuant to the Social Security Act. Disability insurance benefits pursuant to Title II of the Social Security Act are paid to disabled persons who have contributed to the Social Security program regardless of financial need. 42 U.S.C. §§ 401-425. Supplemental Security Income ("SSI") benefits under Title XVI of the Act are paid to disabled "financially needy individuals," regardless of their insured status. 42 U.S.C. §§ 1382-1383; *Smith v. Berryhill*, 587 U.S. 471, 474-75 (2019). Under both programs disability is defined as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (internal quotations omitted).

To establish eligibility for benefits based on disability, the claimant must show they suffer from a medically determinable physical or mental impairment which is expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months, and the impairment renders the claimant incapable of performing the work they previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. 20 C.F.R. § 404.1505. If a claimant meets both of these requirements, they are by definition "disabled." *See, e.g.*, *Frost v. Barnhart*, 314 F.3d 359, 365 (9th Cir. 2002). To be entitled to disability insurance benefits pursuant to Title II, the claimant must also establish they were either permanently disabled, or subject to a condition which became so severe as to disable them, prior to the date upon which their disability insured status expired, i.e.,

prior to their "date last insured" for benefits. *See*, *e.g.*, *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).[2]

A five-step sequential evaluation governs eligibility for benefits under both Title II and Title XVI. *See* 20 C.F.R. § 416.920; *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Bowen*, 482 U.S. at 140-42. First, the claimant must establish they were not gainfully employed at the time of their application. *See* 20 C.F.R.§ 416.920. Next, the claimant must be suffering from a "medically severe" impairment or "combination of impairments." *Id.* The third step is to determine whether any of the claimant's impairments meets or equals one of the "listed" impairments included in Appendix 1 to this section of the Code of Federal Regulations. *See id.* If any of the claimant's impairments meets or equals one of the impairments listed in Appendix 1, the claimant is conclusively "disabled." *See id.* At the fourth step of the process the ALJ determines whether the claimant, despite their impairments, can perform work similar to work they have performed in the past. *Id.* This requires the ALJ to make an assessment of the claimant's "residual functional capacity" to do work-related tasks on a sustained basis. A claimant whose "residual functional capacity" allows them to perform their "past relevant work," despite their impairments, is denied benefits. *Id.*

The claimant bears the burden of proof throughout the first four steps of the evaluation. *See White v. Kijakazi*, 44 F.4th 828, 833 (9th Cir. 2022); *Andrews v. Shalala*, 53 F.3d 1035, 1040 (9th Cir. 1995); *Smith v. Commissioner of Soc. Sec. Admin.*, 678 F. Supp. 3d 1131, 1134 (D. Ariz. 2023); *Bruce v. Kijakazi*, 711 F. Supp. 3d 1217, 1223 (D. Nev. 2024). At step five of the evaluation the burden shifts to the ALJ to demonstrate the claimant can perform substantial gainful work that exists in the national economy, given their residual functional capacity. *See*, *e.g.*, 20 C.F.R. § 404.1520(a)(4)(v); *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014). In making this determination the ALJ must consider factors such as the claimant's age, education, and past work experience.

---

[2] Plaintiff was last insured for disability insurance benefits on December 31, 2025. (ECF No. 9-3 at 31).

20 C.F.R. § 404.1520(a)(4)(v). If the claimant can perform work substantial gainful work that exists in the national economy, the ALJ must find that the claimant is not disabled. *Id.* If the claimant is not capable of such work, the analysis concludes with a finding that the claimant is disabled and entitled to benefits. *Id.*

**III. Standard of Review**

The Court's jurisdiction extends to review of the final decision of the ALJ denying Plaintiff's application for Social Security disability-based benefits. *See* 42 U.S.C. § 405(g). Judicial review of a decision of the ALJ is based upon the pleadings and the administrative record of the contested decision. *See id.* The scope of the Court's review is limited to determining whether the ALJ applied the correct legal standards to Plaintiff's claims for benefits and whether the record as a whole contains substantial evidence to support the ALJ's findings of fact. *See id.* § 423; *Allen v. Kijakazi*, 35 F.4th 752, 756 (9th Cir. 2022); *Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020).

Satisfying the substantial evidence standard requires more than a scintilla but less than a preponderance of record evidence. *E.g.*, *Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019). Substantial evidence is only a "modest burden," *Smith v. Kijakazi*, 14 F.4th 1108, 1111 (9th Cir. 2021), requiring only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 587 U.S. at 103 (citation omitted).[3] *See also Woods v. Kijakazi*, 32 F.4th 785, 788 (9th Cir. 2022). Substantial evidence has been defined as the amount of relevant evidence a reasonable mind would accept as adequate to support a conclusion. *Smith v. Kijakazi*, 14 F.4th at 1154. *See also Woods*, 32 F.4th at 788; *Garrison*, 759 F.3d at 1009. Logically, a quantum of evidence is not substantial if it is outweighed by the evidence supporting a contrary conclusion. *See Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992); *Kent v. Schweiker*, 710 F.2d

---

[3] The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. … And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high.

*Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (internal citations omitted).

110, 114 (3d Cir. 1983); *Smith v. Kijakazi*, No. 20-cv-01350, 2022 WL 286543, at *8 (E.D. Cal. Jan. 11, 2022). The Court should uphold the Commissioner's decision unless it is premised on harmful legal error or is not supported by substantial evidence. *E.g.*, *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

The Court must consider the record evidence in its entirety, weighing both the evidence that supports and detracts from the Commissioner's conclusion. *See*, *e.g.*, *Luther v. Berryhill*, 891 F.3d 872, 875 (9th Cir. 2018). A reviewing court may not affirm the Commissioner's denial of benefits by isolating a specific quantum of supporting evidence. *See Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017); *Revels v. Berryhill*, 784 F.3d 648, 654 (9th Cir. 2017). Where "the evidence can reasonably support either affirming or reversing a decision," the Court may not substitute its judgment for that of the Commissioner. *Garrison*, 759 F.3d at 1010. *See also Shaibi v. Berryhill*, 883 F.3d 1102, 1108 (9th Cir. 2017); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). And if the Commissioner's legal error was harmless, i.e., if there is substantial evidence in the record to support the Commissioner's conclusion on the challenged issue absent the legal error, the case need not be remanded for further proceedings. *See*, *e.g.*, *Ford*, 950 F.3d at 1154; *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir. 2015).

**IV. Record on Appeal**

Plaintiff was born in 1972, and completed four years of college. (ECF No. 9-3 at 50; ECF No. 9-7 at 4). Plaintiff worked as a limousine company dispatcher from September of 2017 through March of 2020, and he worked as a dispatcher for a plumbing company from July of 2021 through November of 2022. (ECF No. 9-6 at 22-38).

Plaintiff's earning record indicates he had minimal earnings in 1993 and 1994, and he earned between $28,000 and $47,000 in 1996 through 1998. (ECF No. 9-6 at 29). Plaintiff reported earnings of between $27,000 and $54,000 in 1999 through 2005, but minimal earnings in 2006, only $50 in 2007, less than $15,000 in 2008, approximately $22,000 in 2009, approximately $3,900 in 2010, and between $17,000 and $32,000 in

2011 through 2018. (ECF No. 9-6 at 29-30). Plaintiff earned $18,780 in 2021 and $36,217 in 2022. (ECF No. 9-6 at 30, 39).[4]

Plaintiff reported to his medical care providers that he was diagnosed with ulcerative colitis in 2005 (ECF No. 9-3 at 36, citing, e.g., ECF No. 9-8 at 5), and the record indicates he continued working, to some extent, until he quit his last job in November of 2022. In his application for disability benefits Plaintiff stated that he began treatment for ulcerative colitis and diverticulitis with Dr. Fares at HonorHealth begining in 2020. (ECF No. 9-7 at 6). Plaintiff reported being treated for hypertension by Dr. Makhni at HonorHealth from 2019 through 2021. (*Id.*).

Plaintiff asserts he became unable to work in November of 2022. The only medical treatment records in the record on appeal with regard to Plaintiff's ulcerative colitis are four treatment notes from HonorHealth from November of 2022 through April of 2023, and one from Deer Valley Family Practice. (ECF No. 9-8). The treatment notes from HonorHealth are all in regard to treatment for ulcerative colitis. (*Id.*).[5] The only continuing medication prescribed to Plaintiff throughout the available medical record was mesalamine, an oral medication similar to aspirin used to treat flare-ups of "mild" ulcerative colitis.

Plaintiff was seen by Dr. Fares at HonorHealth North Valley Gastroenterology ("NVG") on November 19, 2022, at the approximate time that he alleged he became unable to work. (ECF No. 9-8 at 22). Plaintiff reported "no significant GI complaints,"

[4] Although there is no information in the earnings record regarding 2019 and 2020, in his application for benefits Plaintiff stated that he worked for the limousine company from September of 2017 through March of 2020, and that he worked for the plumbing company from July of 2021 through November of 2022. The record is absent an explanation of why Plaintiff did not work from April of 2020 through June of 2021, or why there were no earnings reported in 2019 or 2020, but Plaintiff does not aver that his medical condition became so severe as to preclude him from work prior to November of 2022.

[5] The record also includes treatment notes from Affiliated Dermatology from March of 2023 through August of 2023. (ECF No. 9-8 at 66-85). Plaintiff was treated for verruca vulgaris, "cauliflower-like bumps caused by viral infections spread through direct contact," usually resolve[d] with treatment," and actinic keratoses, a result of sun-damaged skin, and irritated seborrheic keratosis, which are benign growths. (ECF No. 9-8 at 66-81). The record also includes notes from HonorHealth regarding a hernia repair procedure in 2017. (ECF No. 9-8 at 146-76).

and he reported no change in bowel habits. (*Id.*) He reported no abdominal pain, no nausea and vomiting, and no diarrhea or constipation. (*Id.*). Plaintiff reported he had been diagnosed with hypertension in November of 2020. (ECF No. 9-8 at 4). He also reported a history of ulcerative colitis ("UC"), which he advised had been first diagnosed in 2005. (ECF No. 9-8 at 5). The treatment notes state: "Patient is currently maintained on Mesalamine 4, 800 mg daily. He reports doing fairly well with no significant GI complaints. There are no symptoms of abdominal pain, dysphagia, vomiting, change in bowels or overt GI bleeding." (*Id.*). Dr. Fares noted: "No diarrhea or constipation." (*Id.*). The notes from this appointment at NVG reference a colonoscopy performed in June of 2021 which had revealed "Scattered areas of mucosal erythema, edema & scarring with numerous pseudo polyps involving the entire colon with rectal sparing. Biopsied. The examined portion of the ileum was normal. Biopsied. Internal hemorrhoids." (*Id.*). Plaintiff, who is 5 feet 7 inches tall, weighed 210 lbs. (ECF No. 9-8 at 7). It was recommended that Plaintiff continue on mesalamine, take probiotics, and schedule a colonoscopy in a year. (*Id.*).

Plaintiff filed his application for Social Security disability insurance benefits approximately two months after this appointment with Dr. Fares, on January 16, 2023.

Plaintiff was seen at Deer Valley Family Practice on February 27, 2023. (ECF No. 9-8 at 20). He requested a referral for ulcerative colitis treatment because he had changed to a new health plan and needed a new referral to his gastroenterologist, Dr. Fares. (*Id.*). Plaintiff's blood pressure was elevated, and "Patient reports he has white coat hypertension. *His blood pressure is elevated at a physician's office. But otherwise normal*. He had been on blood pressure medications several years ago. But *elected not to continue*. He reports that some medications cause issues with his ulcerative colitis." (*Id.*) (emphasis added). Plaintiff reported no change in appetite and did not report fatigue, and he was not nervous or anxious. He reported no change in his GI symptoms, and he did not appear ill. (ECF No. 9-8 at 20-21).

On April 18, 2023, Plaintiff was seen by Dr Fares at NVG. Dr. Fares noted Plaintiff's last colonoscopy was in June of 2021. (ECF No. 9-8 at 16). A review of symptoms indicated no abdominal pain or distension, no nausea or vomiting, no heartburn, hematemesis, melena (a sign of damage to the GI tract), or hematochezia (a symptom of diverticular and/or inflammatory bowel disease), but Plaintiff did report diarrhea. (*Id.*). Plaintiff reported 8-12 soft bowel movements daily with no bleeding. (*Id.*). (ECF No. 9-8 at 18). Plaintiff was continued on mesalamine and a colonoscopy was scheduled. (ECF No. 9-8 at 19). At this appointment Plaintiff reported "Frequency of Communication with Friends and Family: Three times a week," and "Frequency of Social Gatherings with Friends and Family: More than three times a week." (ECF No. 9-8 at 18).

Plaintiff was seen via telehealth at NVG on April 19, 2023. (ECF No. 9-8 at 15). Plaintiff was scheduled for a colonoscopy and asked to be provided with Xanax due to his anticipated anxiety when he would be placed with an IV prior to this procedure. (*Id.*).

In a function report completed May 27, 2023, Plaintiff averred he lived in a house with his girlfriend. (ECF No. 9-7 at 26). After denying pain to Dr. Fares in November of 2022 and April of 2023, Plaintiff reported:

> The frequent pain from ulcerative colitis is very distressing and limiting. I require very frequent visits to the bathroom due to the diarrhea, pain and more normal bowel movements. It is very difficult to dispatch and communicate while experiencing frequent intestinal pain. Monitoring the dispatching needs and duties are often interuppted [sic] with the need to go to the bathroom. Trying to deal with the colitis condition causes stress stress and anxiety.

(ECF No. 9-7 at 26). With regard to his daily activities, Plaintiff stated:

> I wake up and require an hour or more total of going to the bathroom, in several separate visits usually. I have 8 to 12 bowel movements /day while I do simple household chores, visit/care for my mother across the street, occasionally play music (drums) and watch TV/listen to music. I cook and act as a homemaker.

(ECF No. 9-7 at 27).

Plaintiff stated he took care of his mother "part-time" and took care of household tasks for his girlfriend. (*Id.*). He also fed, watered, and otherwise took care of a cat, cleaning the litterbox and taking the cat to the vet. (*Id.*). He stated that his conditions affected his sleep because he would "wake up a few times with pain and need to go to bathroom." (*Id.*). Plaintiff did not have any difficulty taking care of his own hygiene. He stated that he needed "to watch what I eat/maintain good diet." (*Id.*). Plaintiff reported he was able to prepare complete meals, and that he prepared food daily. (ECF No. 9-7 at 28). Plaintiff was able to perform daily household cleaning, do laundry, and mow the lawn once per month. (*Id.*). Plaintiff was able to go outside a few times per day, walk, and drive a car, and go out alone. He shopped for food, clothes, and household items in stores and online three times per week, for an hour each time. (ECF No. 9-7 at 29). Plaintiff described his hobbies and interests as drumming, reading, watching TV, and visiting his mother, and he was able to do these things daily "except when colitis is especially severe." (ECF No. 9-7 at 30). He spent time with others watching television, going to restaurants, and visiting at home, stating he did these things daily. (*Id.*). With regard to changes in social activities since his illnesses began, Plaintiff stated "I don't go out as much, I avoid restaurant visits more, I don't plan events." (*Id.*).

With regard to how his illness affected his abilities, Plaintiff stated his illness affected his ability to complete tasks, concentrate, understand, and get along with others. (ECF No. 9-7 at 31). Plaintiff reported: "Completing tasks is difficult to impossible while colitis is flaring. Concentration is difficult to impossible while colitis is flaring or painful. Understanding is made difficult because concentration is impaired. Getting along with others becomes much more challenging with flaring/pain." (*Id.*).

Plaintiff averred he could walk for a quarter-mile before needing to rest for three minutes. (*Id.*). He stated he could pay attention for ten minutes, finish tasks, follow written instructions, and follow spoken instructions "unless colitis is especially bad/flaring." (*Id.*). He reported he got along with authority figures "usually well." (*Id.*).

He reported he could handle stress moderately well and changes in route moderately well. (ECF No. 9-7 at 32).

In the function report Plaintiff stated:

> I believe that my ulcerative colitis and its effects cause me stress and anxiety related to whether or not I'll be able to make it through a work shift or be able to satisfactorily complete duties. The colitis exacerbates stress and anxiety and the stress and anxiety exacerbate the colitis in a cycle.

(ECF No. 9-7 at 33).

Due to his assertion that he suffered from anxiety such that he could not sustain gainful employment, Plaintiff was seen for a consultative psychological examination, at the request of the state agency, on July 25, 2023; the examiner, Dr. Poore, ultimately determined Plaintiff was not suffering from any mental health issue which would preclude him from working. Dr. Poore noted that throughout the limited available medical record Plaintiff's primary psychological issue was anxiety "with needles and some medical procedures" (ECF No. 9-8 at 66), and "white coat" hypertension, i.e., his blood pressure was elevated when a medical care provider was taking a blood pressure reading. (ECF No. 9-8 *passim*).

The notes from the psychiatric evaluation on July 25, 2023, indicate as follows:

> When asked about why [Plaintiff] believed he was being seen by a psychologist and why he was filing a claim, the claimant replied: "I do have a lot of anxiety related to a diagnosis of ulcerative colitis. I have always had anxiety since I was very little which has included white coat syndrome. My medical ailments have gotten so worse it's nearly impossible to work." Mr. Feldman endorsed significant anxiety as well as bathroom-related problems. He did report that this is the first time he is applying for social security disability.
>
> Reported allegations: Ulcerative colitis, diverticulitis, depression, anxiety, and hypertension. Mr. Feldman reported that he is currently being treated with alprazolam which he has been prescribed for the past few months. He did indicate, "I take it on rare occasions. I do have white coat syndrome and I hate needles, so I only take it when I have to go to a doctor's appointment."
>
> He did indicate to having this type of anxiety since he was younger. He did notice that his anxiety has increased over time. He denied being treated with any past psychotropic medications, but reported, "One time I was

given Valium by the dentist because the dentist did not want to prescribe Xanax for a procedure."

Mr. Feldman denied any past psychiatric hospitalizations. He denied a history of outpatient mental health treatment. …

***

When asked about how he had been feeling lately and how his overall functioning was being impacted by his reported claims, Mr. Feldman explained, "I have had ulcerative colitis and 6 colonoscopies since 2005. I feel like there has been a lot of ebb and flow with my ulcerative colitis, but it's near impossible to work now. I tried to work after the pandemic, but it's been hard. I have to go to the bathroom all the time and I have a lot of anxiety about not being persistent with work, not being present, and having to be interrupted because I am having to go to the bathroom all the time." He indicated having significant anxiety, but stated that on the date of the evaluation, it was rated at a 4/10, but did report that when it is bad, it can get up to a 9/10.

Mr. Feldman was noted to be anxious as evidenced by fidgetiness. He was also observed shaking his legs when he sat. His overall affect was noted to be blunted. He did not express much emotion throughout the evaluation despite a cooperative and friendly attitude towards the evaluator. He was observed to have appropriately consistent eye contact, but most of his responses were short and to the point responses. …

Family History/Social History:

… Mr. Feldman denied any exposure to domestic violence in childhood or adulthood. He denied a history of any trauma exposure, but did report that one time, "I spilled paint all over my arm and I ended up using turpentine, but it did not go well." He indicated that "it was kind of a traumatic experience." … When asked about social and leisure activities, he explained, "I like to play the drums, and my brother plays the guitar. I watch TV, I will do yard work, and I do some housework." …

Mr. Feldman reported to attending college for 5 years ("2 at SCC and 3 at ASU") where he received his bachelor's in marketing.

Employment History:

Mr. Feldman is currently not working at this time and indicated that *he quit his job* on "November 7, 2022." He reported that he was dispatching for a plumbing company and that he had been doing customer service for the past 16 months. *He reported that his longest job was at an electronics store where he worked from 1995 to 2006. He believes he has had more than 10 jobs since starting to work.* … When asked about his relationships with bosses and coworkers, he stated, "For the most part, I had good relationships. I did much better with my bosses, but sometimes I had problems with coworkers."

***

Mr. Feldman reported that he first used alcohol at age 14. He reported that the last time that he used was "a couple of months ago." He stated, "I typically will have 1 beer a month, and I had a brief history of heavier use as a teenager. It's rare that I drink because I have so many stomach problems." Mr. Feldman reported to first using cannabis at age 14 and stated that the last time he used was about 3 weeks to 4 weeks ago. He stated, "I do use marijuana a couple of times per month when I have a really bad flare-up. I will smoke or do edibles." Mr. Feldman did report to trying several different substances, but insisted that they were "sporadic, at a party, and that they were never regularly used." … Mr. Feldman denied any heavy periods of drinking, substance use, or illicit drug use. …

Medical History:

Mr. Feldman reported that he is currently being treated by his gastroenterologist who typically prescribes his medications. He is being treated for ulcerative colitis. He is currently being prescribed alprazolam [a benzodiazepine, Xanax] and Lialda [mesalamine]. He reported to going to a dermatologist regularly. … He reported to having 6 colonoscopies. …

Behavioral Observations

… His motor activity was fidgety throughout the evaluation as evidenced by shaking in his legs and fidgetiness in his hands due to what appeared to be interference caused by anxiety. He did not demonstrate any difficulties with attention, concentration, or memory throughout the interview. … His thought content and thought processes appeared to be appropriate. He showed no overt signs of perceptual disturbance on this date. … He presented with a fair fund of knowledge. His insight and judgment were both good. Pain behaviors were not observed on this date.

Functional Assessment/Activities of Daily Living:

Mr. Feldman reported that he gets up in the morning around 10 o'clock a.m. He … takes care of his hygienic responsibilities regularly and "about every other day." He reported that he takes his medications regularly and as prescribed. He reported that he is able to manage his finances well and independent of supports. … Mr. Feldman reported that he has recently started taking care of his mom, which has caused some stress. He reported that he manages chores around his house "okay." He indicated that throughout his day he will drum, listen to music, and help his mother. He also reported that he runs errands, watches TV, plays with his cat, and he will read. He did report that he ends his day between 12 (midnight) and 1:00 a.m. He did report that he is able to fall asleep but that he does often wake up every hour due to stomach pain and that he does toss and turn throughout the night.

Diagnostic Impression - DSM 5-TR

Unspecified Anxiety Disorder

> Summary/Conclusions
> Based on the available information coupled with the claimant's clinical presentation on the date of the evaluation, there appears to be enough evidence to support the above-referenced diagnostic conclusion. Mr. Feldman did report to always having anxiety since he was younger, especially related to going to the doctor. He endorsed higher levels of anxiety due to medically-related ailments. He also reported anxiety because he was not able to be consistently present for work and that his work would often be interrupted due to going to the bathroom all the time because of ulcerative colitis. … When asked about how he had been feeling and how his overall functioning was being impacted by his reported claims, Mr. Feldman reported that due to his diagnosis of ulcerative colitis, he has found it near impossible to work. …
> It is imperative to note that *records only included an adult function report that was completed by the claimant on 05/27/2023*. …
> As this was not a medical evaluation, a more definitive opinion regarding the severity of the claimant's medical ailments and their impact on his functioning is being deferred to the assigned medical provider for a more accurate opinion. *There is not enough evidence to suggest that the claimant's cognitive capabilities are being impacted at this time as evidenced by his score of 30/30 on the MMSE*. It does appear that anxiety-related symptoms are a result of medically-related ailments. However, Mr. Feldman did report to having heightened anxiety anytime he does go to the doctor as well as a fear of needles ….
> My prognosis that the claimant will be able to gain any major improvements in his overall functioning any time in the next 6 months is fair and contingent upon his ability to seek appropriate outpatient mental health treatment. …

(ECF No. 9-8 at 86-92) (emphasis added).

Plaintiff was seen by Dr. Fares on August 22, 2023. (ECF No. 9-3 at 120). The notes state Plaintiff reported "8-12 soft BMs daily with no bleeding. There are no symptoms of abdominal pain, dysphagia, vomiting or fever." (*Id.*). With regard to a June 19, 2023, colonoscopy, Dr. Fares noted "Scattered areas of moderate mucosal inflammation, scarring & pseudopolyps extending from the restosigmoid and transverse colon. Biopsied. The examined portion of the ileum was normal. Diverticulosis in the sigmoid colon. Internal hemorrhoids." (ECF No. 9-8 at 120-21). Dr. Fares compared these results with the colonoscopy performed in 2021. (ECF No. 9-8 at 121). Dr. Fares

again noted no abdominal pain, no nausea, no rectal bleeding. (*Id.*). Plaintiff was continued on mesalamine and an electrolyte. (*Id.*). Zeposia, a medication for ulcerative colitis, was added. (ECF No. 9-8 at 123-24). Dr. Fares suggested a follow-up colonoscopy in one to two years. (ECF No. 9-8 at 123-24).

Plaintiff's claims for disability benefits were denied initially on October 19, 2023. (ECF No. 9-4 at 2). The agency psychologist reviewed the Dr. Poore's report, the available medical records, Plaintiff's function report, and Plaintiff's work history. (ECF No. 9-4 at 4). The agency psychologist noted there was no history of mental health treatment for anxiety. (ECF No. 9-4 at 5). The psychologist noted Plaintiff reported being prescribed alprazolam by his gastroenterologist, but that Plaintiff also reported he "rarely takes this." (ECF No. 9-4 at 6). They noted Plaintiff could perform his activities of daily living and care for his mother. (*Id.*). Accordingly, the agency psychologist determined Plaintiff's anxiety was not a severe impairment. (ECF No. 9-4 at 6-7).

With regard to physical impairments, the agency physician noted Plaintiff's gastrointestinal symptoms could be expected to produce pain or other symptoms, but Plaintiff's statements about the intensity, persistence, and functionally limiting effects of his symptoms were not substantiated by the objective medical evidence. (ECF No. 9-4 at 7). The physician concluded Plaintiff's statements regarding his symptoms were not consistent with the total medical and non-medical record evidence, including the colonoscopy results and Plaintiff's reported activities of daily living. (ECF No. 9-4 at 9). The physician noted Plaintiff could be found to suffer from "intermittent diarrhea." (ECF No. 9-4 at 8). They also noted Plaintiff's allegation of diverticulitis was not verified as a functional limitation. (ECF No. 9-4 at 9). The physician reviewed the available HonorHealth records and determined Plaintiff had no somatic (pain or pain perception) limitations, and further concluded the record supported a finding that Plaintiff was not disabled because given his age, education, and residual functional capacity, he could adjust to work available in the national economy. (ECF No. 9-4 at 10).

Plaintiff sought reconsideration of the denial of benefits. (ECF No. 9-5 at 13). Plaintiff asserted, through his counsel, that he was "still disabled and unable to work and take care of himself," and he stated he was "submitting additional evidence" with his request for reconsideration. (*Id.*).[6] Plaintiff stated he was "still disabled due to Ulcerative Colitis, Diverticulitis, Hypertension." (ECF No. 9-7 at 53).

On reconsideration of the denial of benefits in November of 2023 a different state agency physician reviewed the available medical evidence. (ECF No. 9-4 at 23-25). The reviewing physician determined Plaintiff could perform unskilled work at the medium exertional level. (ECF No. 9-4 at 28). The physician took into account Plaintiff's "intermittent diarrhea" that "would interfer[e] with daily work activities." (ECF No. 9-4 at 27). As with the prior assessment, the physician concluded Plaintiff was "not disabled" given his age, education, and residual functional capacity. (ECF No. 9-4 at 28). Additionally, at the reconsideration level the reviewing physician opined Plaintiff's statements regarding his psychological symptoms were only partially consistent, considering the total medical and non-medical record evidence. (ECF No. 9-4 at 35).

Plaintiff's claims for disability benefits were denied on reconsideration on November 28, 2023 (ECF No. 9-4 at 22).

A hearing before an ALJ was conducted on May 30, 2024, at which Plaintiff was represented by counsel. (ECF No. 9-3 at 47-48). Plaintiff's counsel advised the ALJ:

> We believe the claimant would be found disabled at Step 5 due to off task behavior needing to use the restroom too frequently and due to absenteeism. He has flare ups once every two months that may take him off of work for five to six days and we believe both of these will be work preclusive.

(ECF No. 9-3 at 49). The ALJ conducted the following colloquy with Plaintiff:

> Q. [by the ALJ] And what does a Dispatcher do at Roto-Rooter?
> A. [by Plaintiff] Sit in a cubicle with a computer and phone, takes some phone calls, well, a lot of phone calls from plumbers, customers,

[6] There are no medical records in the record on appeal subsequent to those of Plaintiff's appointment with Dr. Fares in August of 2023.

> intercompany people, dispatches the client calls. Other people generally took the orders, the customer service calls, and then the dispatcher send them out to the plumbers and kind of manages the plumbers and technicians.

(ECF No. 9-3 at 50).

> Q. All right. It Looks Like before Roto-Rooter, you worked for a company called Transtyle. … And what does a dispatcher at Transtyle [do].
> A. Same basic thing. Sit at a desk on a computer and phone, send out the calls to the drivers, you know, with the hotel people, a lot more on the phone and customers and drivers.

(ECF No. 9-3 at 51).

> Q. … Do you help with the maintenance of the house, you know, cutting the lawn, doing any fixes around the house.
> A. Some, yes.
> Q. And are you able to prepare your own meals?
> A. Yes.
> Q. And what about cleaning? Do you help with the cleaning of the house?
> A. Yes.
> Q. Do you have a source of income?
> A. No. … [Girlfriend] does chip in on the household bills [in] the amount of $300 a month, …
> Q. And you pay the remainder of the bills?
> A. Yes.

(ECF No. 9-3 at 54).

> Q. … how are you paying the rest of your bills?
> A. I had savings is what I've been using for the past year and a half.
>
> ***
>
> Q. Are you driving on a daily basis?
> A. No. It's a every three days on average.
> Q. Where do you drive to?
> A. The grocery store or about it. Simple errands such as that.

(ECF No. 9-3 at 55).

Plaintiff was then questioned by his counsel:

> Q. … why don't you tell the Judge in your words what would keep you from working a full-time job?
> A. Well, the digestive condition such as ulcerative colitis which is what I've been diagnosed with can be very painful and it's kind of ever present. It just varies in how painful it is. And you tend to have these flare ups when

> you have ulcerative colitis every couple months on average sometimes more frequent that are extremely painful, cause me to have to go to the bathroom very frequently. …
> So, I find it very difficult to keep working consistently when I have to visit the bathroom many times while at work. And then that causes problems there as far as you know embarrassment, the stress and anxiety from that. And then I think that kind of can contribute to poor job performance and it's all because I'm just in pain in my stomach or colon a lot of the time.
> Q. … How often are you having flare ups? How often are you getting to use the restroom? How often are you having painful bouts with your stomach?
> A. Well the frequent bathroom use is daily. I mean, on a good day, I'm still visiting the bathroom while at work six to ten times. During a flare up which again is an average of every couple months it's almost constant that I feel the need to be in there and it's just constant stomach or colon thing.
> Q. And a couple months means two months or does that mean four months?
> A. Two months but that's an average of course it's not totally predictable but I again average of two months.
> Q. And when you have these flare ups, every two months or so, how long do your flare ups last you? Is it one day, is it two days, is it a week? How long does it last?
> A. I'd say a week is a good average. One or two days, never that short. A bad flare up like that every two months, yeah, a week or more.
> Q. Do you think if you got a full-time job, you'd be calling in sick, basically, you know, not showing up to work, three to four days every two months at least?
> A. Yes, I think that's a good estimate. And I was doing that. I used up all my sick time at work.

(ECF No. 9-3 at 55-57).

The ALJ posed a question to the testifying vocational expert ("VE"): "What are the tolerances, employer tolerances for let's say time off task during an eight-hour work day?" The VE responded: "… typically for unskilled entry level occupations no greater than ten percent. For some semi-skilled and skilled occupations, it may be 15 percent. … the past relevant work, would be no greater than ten percent." (ECF No. 9-3 at 60-62). With regard to an employer's tolerances for absenteeism per month, the VE stated: "what I've got from employers that if an individual has one unexcused, undeclared absence[7]…,

[7] It is not clear what an "unexcused, undeclared absence" would constitute rather than, or compared to, or including, the use of sick leave.

for three consecutive months that typically exceeds employer tolerances. Over a 12-month period, six to ten absences of that nature may be tolerated obviously it would vary by employer." (*Id.*). With regard to unscheduled breaks, the VE testified there would be "no tolerance for unscheduled breaks on an ongoing or chronic basis." (*Id.*). The VE further testified, in response to the question "could someone perform work that exists in significant numbers in the national economy if any of these tolerances were exceeded on an ongoing basis?" "I do not believe so. No." (*Id.*). With regard to the VE's opinion being consistent with the Dictionary of Occupational Titles, "as well as it's [sic] companion publication The Selective Characteristic of Occupations," the VE stated: "… it has been. With the exception of addressing the hypothetical factors of off task time, absenteeism, and unscheduled breaks. To respond to those, I've relied upon my knowledge acquired, observations made over the course of providing vocational rehabilitation and consulting services since 1990." (*Id.*).

At the conclusion of the hearing the ALJ left the record open to allow Plaintiff's counsel to obtain additional medical records. On July 4, 2024, counsel advised the ALJ: "The record was left open after the hearing to obtain outstanding medical records. We no longer anticipate any more records for this case as *the claimant has no other treatment with their providers*. The Claimant respectfully requests that the record be closed for decision making." (ECF No. 9-7 at 88) (emphasis added).

**V. The ALJ's Decision**

In the written decision denying benefits the ALJ determined Plaintiff had not engaged in substantial gainful activity since November 17, 2022, the alleged date of the onset of disability, and that the date he was last insured for benefits was December 31, 2025. (ECF No. 9-3 at 31). The ALJ concluded Plaintiff had the severe, medically determinable impairment of ulcerative colitis. (ECF No. 9-3 at 33). The ALJ found that hypertension and diverticulitis were not severe because they would have no more than a minimal effect on Plaintiff's ability to work, noting there was no medical evidence supporting a conclusion that hypertension or diverticulitis "had a significant functional

impact for any 12-month period." (*Id.*). The ALJ further found that depression or anxiety "considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere." (ECF No. 9-3 at 35).[8]

At the next step of the sequential evaluation the ALJ determined Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*). In reaching this conclusion, the ALJ stated they had considered the listing for inflammatory bowel disease and the listings regarding digestive disorders. (*Id.*). The ALJ noted the paucity of any objective clinical or diagnostic findings "that are the same as or medically equivalent to the criteria of any listed impairment." (*Id.*).

At the fourth step of the sequential evaluation, "[a]fter careful consideration of the entire record," the ALJ determined Plaintiff had the residual functional capacity to perform work at the medium exertional level. (*Id.*). The ALJ stated they had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." (*Id.*).

The ALJ further explained:

> The undersigned considered all of the claimant's subjective complaints, including the subjective complaints from the hearing testimony and written submissions (Ex. 5E [the May 2023 Function Report] and Testimony). The claimant reported symptoms arising from ulcerative colitis primarily limited the claimant's ability to work. Specifically, the claimant

---

[8] The ALJ noted:

> The claimant reported depressive and anxiety-related symptoms, but there is minimal objective evidence of the claimant seeing a psychiatrist consistently, being hospitalized for psychiatric treatment, or receiving any specialized psychiatric/psychological care. This is inconsistent with the alleged severity of the claimants mental symptoms and functional limitations and objective findings in the record. Accordingly, based on the minimal and unremarkable mental health evidence in the record, the undersigned finds that the claimant had no severe mental impairment.

(ECF No. 9-3 at 35).

asserted that the impairments caused symptoms such as intermittent diarrhea, interruptions and difficulty completing tasks due to frequent use of the restroom, chronic pain, needing to monitor his diet, unable to plan events, and pain causes difficulty concentrating and getting along with others. Other subjective statements include complaints of diverticulitis, hypertension, and mental health complaints. The claimant further suggested that difficulty with these impairments limited the claimant's ability to work and perform activities of daily living. The claimant also admitted to living with his girlfriend, taking care of his mother that lives across the street, taking care of the household for his girlfriend, taking care of his cat, no problems with his personal care, he does not need any reminders, he prepares meals, he does household chores when not in pain, he goes outside a few times a day, he walks and drives a car, he is able to go out alone, he shops in stores and online, he manages money, he spends time with others in person and on the phone, he gets along with others, and he has hobbies that he does except when his colitis is severe such as drumming, reading, watching television, and visiting his mother.

*The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual*. Although the claimant has received treatment for the allegedly disabling impairment, that treatment has been essentially routine and conservative in nature. Although the claimant has received treatment and has been prescribed and has taken appropriate medications for the allegedly disabling symptoms and impairments, which would normally weigh somewhat in the claimant's favor, *the medical record reveals that the treatment and medications have been relatively effective in controlling the claimant's symptoms. The evidence of record showed that the claimant's ulcerative colitis has been maintained and stable on his medication regimen, as described detail below. These discrepancies diminish the persuasiveness of the claimant's subjective complaints and alleged functional limitations*.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The undersigned has reviewed and considered the complete medical history consistent with 20 CFR 404.1529 and 416.929 (Exs. 1F-9F). The positive objective clinical and diagnostic findings since the alleged onset date detailed below do not support more restrictive functional limitations than those assessed herein.

The evidence of record showed that the claimant received treatment and medication management through his healthcare providers including

> gastroenterology for his complaints of ulcerative colitis which was diagnosed in 2005 (Ex. 1F, 2F, 3F, 4F, 8F). The examinations generally revealed soft, lax and non-tender to palpation in the abdomen; no rebound or guarding; no masses or hernias upon palpation; alert and oriented times three; no involuntary movements; no focal deficit; normal ranges of motion; and no abdominal tenderness.

(ECF No. 9-3 at 35-36) (emphasis added).

> In November 2022, the progress notes showed the claimant reported doing fairly well with no significant GI complaints and no symptoms of abdominal pain, dysphagia, vomiting, change in bowels, or overt GI bleeding (Ex. 1F, p. 4). On multiple occasions in 2023, the treatment notes indicated he was maintained on Mesalamine 4,800mg daily; he has 8-12 soft bowel movements daily without bleeding; there were no symptoms of abdominal pain, dysphagia, vomiting, or fever; and examination was within normal limits (Ex. 2F, p. 6, 8; 8F, p. 5). The progress notes in August 2023 revealed no abdominal distention, no abdominal pain, no nausea or vomiting, no heartburn or dysphagia, diarrhea, no hematemesis, no melena, no hematochezia, and the examination was within normal limits (Ex. 8F, p. 8). In addition to the physical examinations, the diagnostic evidence also supports the above residual functional capacity. For instance, a colonoscopy in June 2023 demonstrated scattered areas of moderate mucosal inflammation, scarring, and pseudo polyps extending from the rectosigmoid to transverse colon, normal ileum, and internal hemorrhoids which were biopsied (Ex. 8F, p. 6).
>
> Thus, despite the claimant's subjective complaints, the undersigned finds that the objective medical evidence regarding the claimant's impairments supports the above residual functional capacity assessment.
>
> The undersigned did not provide articulation about the evidence that is inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520b(c) and 416.920b(c*)*.
>
> In determining the claimant's residual functional capacity, the undersigned finds that the opinions of the prior administrative findings are persuasive (Ex. 2A, 3A, 5A, 8A).[9] These physicians assessed that the claimant was also able to perform a range of work at the medium exertional level with similar findings in the degree of specific function-by-function limitations. These opinions are all reasonable and supported by the record as a whole. The State agency physicians are highly trained and experts in Social Security disability evaluations in evaluating disability claims and

---

[9] The ALJ refers to the agency physicians' evaluations regarding the initial disability determination and the disability determination on reconsideration.

> had the benefit of reviewing the longitudinal treatment record from multiple providers as well as the objective testing and the claimants written subjective complaints prior to formulating their opinions. Therefore, these opinions appear to be the most consistent and supported by the totality of the evidence.
>
> Based on the foregoing, the above residual functional capacity assessment in this finding is based on all of the relevant evidence in the case record. *The relevant medical evidence and other evidence in the case record only partially support the claimant's statements regarding the alleged intensity, persistence, and limiting effects of symptoms*. Accordingly, the undersigned finds that the above residual functional capacity assessment is the most that the claimant could do on a regular and continuing basis despite the claimant's impairment-related limitations.
>
> … The claimant is capable of performing past relevant work as a service dispatcher. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

(ECF No. 9-3 at 37) (emphasis added).

The ALJ determined:

> Based on the claimant's documented vocational background and the claimants testimony, the vocational expert indicated the claimant's past relevant work included the following occupations:
>
> Dispatcher, service, DOT1 959.167-010, is a sedentary, semiskilled (SVP2 4) occupation as generally performed pursuant to the DOT and as performed by the claimant. This work was substantial gainful activity, was performed long enough for the claimant to achieve average performance, and was performed within the relevant period …
>
> … In comparing the claimants residual functional capacity with the physical and mental demands of the claimant's past relevant work, the undersigned has determined the claimant is able to perform this past relevant work as actually and generally performed based on the testimony of the vocational expert.

(ECF No. 9-3 at 38).

## VI. Analysis of Claims for Relief

### 1. Evaluation of Plaintiff's symptom testimony

Plaintiff contends the ALJ committed harmful error by rejecting his testimony regarding the severity of his symptoms without providing specific, clear, and convincing

reasons for doing so, supported by substantial evidence in the record. Plaintiff asserts the ALJ failed to "connect anything specific in the medical record to a specific inconsistency" in Plaintiff's hearing testimony when concluding "'the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations.'" (ECF No. 16 at 14).

The claimant bears the burden of proof throughout the first four steps of the sequential evaluation, including providing some evidence that they are not able to engage in any substantial gainful activity due to a medically determinable physical or mental impairment. *See Andrews*, 53 F.3d at 1040; *Bergfeld v. Barnhart*, 361 F. Supp. 2d 1102, 1110 (D. Ariz. 2005). When the only evidence of the severity of symptoms is the claimant's report of their symptoms, an ALJ must engage in an analysis of whether the claimant's testimony regarding their subjective pain or symptoms is credible. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the alleged pain or other symptoms. *Garrison*, 759 F.3d at 1014. The medical evidence need not corroborate the severity of the alleged symptoms, the medical evidence need only establish that the impairment could reasonably be expected to cause some degree of the alleged symptoms. *E.g.*, *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). Subsequently the ALJ can reject the claimant's testimony about the severity of their symptoms "only by offering specific, clear and convincing reasons for doing so." *Garrison*, 759 F.3d at 1014-1015. *See also Smith v. Kijakazi*, 14 F.4th at 1111-12.

However, the ALJ is not required to believe every allegation of disability, i.e., every allegation regarding the severity of the claimant's symptoms, otherwise disability benefits would be available for the asking, a result plainly contrary to the Social Security Act. *See*, *e.g.*, *Ahearn v. Saul*, 988 F.3d 1111, 1116 (9th Cir. 2021). And the Court may set aside the ALJ's decision regarding a claimant's symptom testimony only when the ALJ's decision is not supported by "substantial evidence" or when the decision is predicated on harmful legal error. *Trevizo*, 871 F.3d at 674. "Substantial evidence means

more than a mere scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* And even when the ALJ commits legal error, their decision must be upheld when that error is harmless, i.e., the error "is inconsequential to the ultimate nondisability determination," or when "the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity." *Treichler v. Commissioner of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014). *See also King v. Commissioner of Soc. Sec. Admin.*, No. 19-cv-05669, 2020 WL 5587429, at *2 (D. Ariz. Sept. 18, 2020). Notably, it is the ALJ's prerogative to "determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." *Treichler*, 775 F.3d at 1098. When the record evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the Court must uphold the ALJ's decision. *E.g. Ahearn*, 988 F.3d at 115-16, *citing Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001). *See also Trevizo*, 871 F.3d at 674-75.

The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but concluded Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the "relevant medical evidence" and other record evidence. Plaintiff asserts the ALJ committed legal error by failing to adequately discuss Plaintiff's symptom testimony because they "failed to specify how Plaintiff's testimony was not credible." (ECF No. 10 at 13).

However, the ALJ found that the Plaintiff's treatment for ulcerative colitis was essentially routine and conservative in nature. Their decision notes that Plaintiff received treatment and was prescribed appropriate medications for his symptoms, and the medical record indicated the prescribed medication had been effective in controlling Plaintiff's symptoms. This conclusion is supported by Dr. Fares' treatment notes. The ALJ also noted there was no evidence of aggressive treatment or frequent changes in medication, which would be expected if the Plaintiff's symptoms had worsened and were as severe as

he alleged. An ALJ may properly discount a claimant's subjective pain testimony "by providing a specific, clear, and convincing rationale based on inconsistencies with the record, [the claimant's] self-reported daily activities, and [a] generally conservative treatment plan." *Smartt v. Kijakazi*, 53 F.4th 489, 495, 497 (9th Cir. 2022).

The limited record evidence does not support Plaintiff's allegations with regard to the intensity, persistence, and limiting effects of his symptoms. The only record evidence supporting Plaintiff's allegations regarding the severity and persistence of his symptoms is Plaintiff's hearing testimony, and his allegations are belied by his statements to Dr. Fares. In November of 2022 when Plaintiff asserted to the agency that seventeen years after being diagnosed with ulcerative colitis his condition because so severe that he could no longer work, he reported to Dr. Fares that he had "no significant GI complaints," and he reported no change in bowel habits. He denied abdominal pain, and diarrhea. (ECF No. 9-8 at 3-5). Dr. Fares' treatment notes from November of 2022 state: "Patient is currently maintained on Mesalamine 4, 800 mg daily. He reports doing fairly well with no significant GI complaints. There are no symptoms of abdominal pain, dysphagia, vomiting, change in bowels or overt GI bleeding." (ECF No. 9-8 at 5). Dr. Fares noted: "No diarrhea or constipation." (*Id.*). The notes from this appointment at NVG reference a colonoscopy performed in June of 2021 which had revealed nothing requiring additional testing or treatment. (*Id.*). When Plaintiff was seen at Deer Valley Family Practice on February 27, 2023, one month after asserting his ulcerative colitis and resulting anxiety, and hypertension were so severe he could not work, he told the physician that "he has white coat hypertension. *His blood pressure is elevated at a physician's office. But otherwise normal*. He had been on blood pressure medications several years ago. But *elected not to continue*." (ECF No. 9-8 at 20) (emphasis added). Plaintiff was not nervous or anxious, and he reported no worsening of his GI symptoms. (ECF No. 9-8 at 20-21). Similarly, although at this time Plaintiff was allegedly experiencing symptoms so severe he could not work for several days at a time every other month, when seen by Dr. Fares on April 18, 2023, Plaintiff reported he was not experiencing symptoms such abdominal

pain, hematemesis, melena (a sign of damage to the GI tract), or hematochezia (a symptom of diverticular and/or inflammatory bowel disease), and although he did report 8-12 soft bowel movements daily there was no objective evidence of this, i.e., no rectal bleeding. (*Id.*). (ECF No. 9-8 at 18). Throughout this time period Plaintiff was continued on his medication regimen of mesalamine, an "aspirin like" medication.

A claimant's medication regimen and treatment history are valid factors for evaluating a claimant's symptom testimony. *See* 20 C.F.R. § 416.929(c)(3)(iv)-(v). Pursuant to Social Security Ruling 16-3p, Titles II and XVI: *Evaluation of Symptoms in Disability Claims*, (effective March 28, 2016), an ALJ may discount "the alleged intensity and persistence" of a claimant's symptoms if "the frequency or extent of the treatment" sought "is not comparable with the degree of the individual's subjective complaints." 2016 WL 1119029, at *8. Additionally, there is no medical evidence supporting Plaintiff's allegation that in November of 2022 when he quit his job his condition had worsened, from what he was experiencing in the prior 17 years since his UC had been diagnosed, to the point where he could no longer work. And Dr. Fares' notations regarding Plaintiff's 2021 and 2023 colonoscopy do not indicate any specific areas of concern or need for more aggressive treatment indicating that Plaintiff's condition had worsened during this time period.

The ALJ's conclusion regarding Plaintiff's subjective symptom testimony was supported by "substantial" evidence; notably, there was no evidence in the record, other than Plaintiff's testimony regarding the subjective severity of his symptoms, that Plaintiff's medical condition precluded substantial gainful activity. None of Plaintiff's treating medical care providers opined as to Plaintiff's medical condition subsequent to November of 2022, and both of the physicians who evaluated Plaintiff's very limited medical records opined Plaintiff would be able to sustain gainful activity and that his reports regarding the severity of his symptoms were not supported by the record medical evidence.

The only evidence of Plaintiff's numerous bowel movements, outside of his hearing testimony, was a single report to his treating physician after he applied for disability benefits. Moreover, Plaintiff advised that he quit his job and that his pain, anxiety and embarrassment regarding his frequent bathroom breaks were what rendered him disabled, but there is no record evidence that his employer did not tolerate his frequent breaks or absences from the workplace during the periods when his condition "flared." Plaintiff's subjective reports of symptoms are insufficient proof that he was disabled. The Commissioner is prohibited from granting disability benefits based solely on a claimant's subjective complaints. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.929(a). The ALJ is required to assess whether a plaintiff's statements about their symptoms were consistent with the objective medical evidence and the other evidence in the record. *See* 20 C.F.R. § 416.9929(c)(2)-(3). And in doing so the ALJ is not required to "perform a line-by-line exegesis" of the claimant's testimony. *See Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020); *Cooper v. Kijakazi*, No. 20-15935, 2022 WL 1553170, at *1 (9th Cir. May 17, 2022) (A "granular point-by-point refutation of Plaintiff's testimony is not required."). As the ALJ noted, the record indicates Plaintiff received only conservative treatment for his ulcerative colitis, which supports the conclusion that Plaintiff's somatic symptoms were not as severe as alleged. *See Tommasetti*, 533 F.3d at 1039-40 (concluding evidence that claimant "responded favorably to conservative treatment" was inconsistent with the plaintiff's reports of disabling pain); *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment."); *Bailey v. Colvin*, 659 F. App'x 413, 415 (9th Cir. 2016) (concluding evidence that "impairments had been alleviated by effective medical treatment," to the extent inconsistent with "alleged total disability[,]" provides a specific, clear, and convincing reason for discounting subjective complaints). If a claimant's symptoms were not severe enough to motivate them to seek more or different treatment, they have not carried their burden of showing disability. *E.g.*, *Trevizo*, 871 F.3d at 679.

The ALJ's ultimate findings with regard to Plaintiff's symptom testimony are supported by substantial evidence and are a reasonable interpretation of the total record evidence. *E.g. Ahearn*, 988 F.3d at 1115; *Trevizo*, 871 F.3d at 674-75; *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). *See also Crawford v. Berryhill*, 745 F. App'x 751, 753 (9th Cir. 2018) (rejecting objections to the ALJ's findings that "amount[ed] to advocating for alternatives to the ALJ's rational interpretation of the record and therefore [did] not demonstrate error"); *Vazquez v. Kijakazi*, No. 22-35642, 2023 WL 5453198, at *1 (9th Cir. Aug. 24, 2023) (affirming the ALJ's decision because it was "at least equally rational [as the plaintiff's interpretation of the evidence], and the reasoning is legally sufficient."). The ALJ sufficiently demonstrated they had reviewed the complete record and their decision was a reasonable interpretation of the record, indicating they did not arbitrarily discredit Plaintiff's testimony. *See Sandburg v. Bisignano*, 2025 WL 1473795, at *1 (9th Cir. May 22, 2025). Because the ALJ identified reasons sufficiently specific to allow the Court to conclude the ALJ did not arbitrarily discredit Plaintiff's testimony, and any legal error was harmless because the record shows more than a scintilla of evidence supporting the ALJ's ultimate conclusion, the ALJ's discrediting of Plaintiff's testimony regarding the disabling nature of his ailments should be affirmed. *See*, *e.g.*, *Blanchard v. Bisignano*, No. 24-cv-4359, 2025 WL 2730842, at *1 (9th Cir. Sept. 25, 2025).

**2. The ALJ's assessment of Plaintiff's residual functional capacity**

Plaintiff asserts the ALJ's determination of his residual functional capacity "is incomplete and unsupported by substantial evidence." (ECF No. 10 at 13). Plaintiff argues:

> The ALJ erred in determining that Plaintiff retained the RFC to perform medium work without adequately considering the limitations imposed by Plaintiff's ulcerative colitis. SSR 96-8p requires that an RFC assessment reflect all functional limitations supported by the record, including impairments characterized by episodic or unpredictable symptoms. By failing to include restrictions for unscheduled breaks, frequent absenteeism, and off-task behavior, the ALJ's RFC determination is unsupported by substantial evidence and legally deficient.

(*Id.*).

Plaintiff does not dispute that any aspect of the residual physical functional capacity assessed by the ALJ, such as an ability to sit, stand, walk, lift, or carry, was in error, only that the ALJ improperly assessed a residual functional capacity which did not include absenteeism and unscheduled breaks caused by Plaintiff's reported symptoms of ulcerative colitis. However, Plaintiff overlooks that there was no objective evidence in the record, such as any third-party statement, medical opinion, or repeated and consistent statements by Plaintiff to his medical care providers beginning in November of 2022 when he alleged his ulcerative colitis symptoms had become so severe that he could not work, supporting a conclusion that Plaintiff actually needed to take numerous unscheduled breaks throughout each workday, or that he would be absent from work for five days every other month, due to his ulcerative colitis symptoms. As noted *supra*, during a November 2022 appointment with Dr. Fares, at the time Plaintiff later alleged his symptoms became so severe he was unable to work, Plaintiff told Dr. Fares he had been diagnosed with ulcerative colitis in 2005 and at that time in November of 2022 he reported no change in bowel habits, such as needing to use the bathroom numerous times per day. He denied abdominal pain and diarrhea and he reported "doing fairly well with no significant GI complaints." (ECF No. 9-8 at 5). Upon review by Dr. Fares at that time Plaintiff's June 2021 colonoscopy results revealed nothing of concern and Dr. Fares saw no need to schedule another colonoscopy until June of 2023. Plaintiff saw Dr. Fares again in April and August of 2023, and Dr. Fares continued Plaintiff on conservative treatment notwithstanding that at the April 2023 appointment Plaintiff reported 8-12 soft bowel movements per day. At his April and August of 2023 appointments Plaintiff denied abdominal pain. Dr. Fares never provided a medical source statement of Plaintiff's ability to sustain gainful employment, and Dr. Fares' treatment notes (the only treatment notes in the record) do not support a conclusion that Plaintiff's symptoms would require him to

take numerous breaks throughout each work day and miss several days to a week of work every two months.

An ALJ may reasonably rely on medical source opinions that are persuasively supported and consistent, when formulating the claimant's residual functional capacity. *See Cross v. O'Malley*, 89 F.4th 1211, 1214 (9th Cir. 2024). The only medical source opinions in the record regarding Plaintiff's ability to sustain employment were those of the state agency physicians who both opined Plaintiff could perform a range of medium work with some limitations, and who both opined Plaintiff's somatic complaints were not supported by the record evidence. Dr. Barricks noted that Plaintiff was diagnosed with ulcerative colitis in 2005 but was maintained with medication. The doctor noted that, although Plaintiff reported 12 bowel movements per day, Plaintiff did not report bleeding consistent with such a complaint. The limited treatment notes indicate Plaintiff denied symptoms of abdominal pain and bleeding, and a colonoscopy showed erythema, swelling, scarring, and pseudopolyps, but a biopsy of the polyps was unremarkable, i.e., the biopsy report does not mention any sign of cancer or other life-threatening problems. Plaintiff's physician, Dr. Fares, did not recommend any follow-up testing or a change in medication or other treatment after the 2021 colonoscopy and did not recommend follow-up testing after the 2023 colonoscopy, although he recommended an additional medication.[10] On reconsideration from the denial of benefits a different agency physician concurred with the previous finding that Plaintiff's ulcerative colitis was not disabling and that his reported symptoms were not supported by the record evidence. The agency physicians' opinions support the ALJ's discounting of Plaintiff's somatic allegations and there is no medical opinion in the record which weighs against the agency physicians' opinions.

---

[10] The record does not indicate whether or not Plaintiff actually took the new medication and, if so, whether the medication alleviated any of Plaintiff's symptoms or reduced the frequency of his flare-ups. Plaintiff did not produce any medical records subsequent to the August 2023 appointment with Dr. Fares when this medication was prescribed.

In an appeal of a decision of the Commissioner of the Social Security Administration denying benefits, the "key question" for the Court "is not whether there is substantial evidence that could support a finding of disability, but whether there is substantial evidence to support the Commissioner's actual finding." *Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997). In this matter the only objective medical evidence supports the ALJ's conclusion, and the only evidence that could support a finding of disability is Plaintiff's subjective statements regarding the frequency and intensity of his somatic symptoms, which are not supported by any record medical evidence. The record evidence identified by the ALJ satisfies the permissive substantial evidence requirement. *See Biestek*, 587 U.S. at 102-03 (noting the substantial evidence threshold is "not high"). Even if the evidence was susceptible to a finding in favor of Plaintiff, the ALJ's interpretation of the evidence, including Plaintiff's statements regarding the intensity and persistence of his symptoms, was rational and accordingly the ALJ's conclusion must be upheld. *Woods*, 32 F.4th at 788.

**3. The ALJ's assessment of medical evidence**

Plaintiff contends the ALJ's decision must be vacated because the ALJ did not clearly articulate how persuasive they found "all of the medical opinions in the record," with regard to their supportability and consistency. (ECF No. 10 at 15-16). Plaintiff alleges the ALJ's analysis was "improper" because they did not specifically address the agency physicians' findings. (ECF No. 10 at 16).

The only medical source opinions of record are those of the reviewing agency physicians. Both of the physicians who reviewed Plaintiff's claims found that Plaintiff could perform a reduced range of medium work. The ALJ concluded these physicians' findings were supported, noting the physicians' training in evaluating disability claims and noting they had the benefit of reviewing the longitudinal treatment record, the objective test results, and Plaintiff's written statements regarding his subjective complaints. With regard to consistency, the ALJ determined these physicians' findings were consistent with the evidence as a whole.

An ALJ must only explain the considerations of consistency and supportability in sufficient detail to allow a reviewing court to determine whether the ALJ's reasoning is free of legal error and supported by substantial evidence. *See Ford*, 950 F.3d at 1154; *Shelley D. v. Kijakazi*, No. 20-cv-0014, 2021 WL 4443322, *7 (D. Idaho 2021) (holding the ALJ's conclusions must "continue to satisfy metrics of both articulation and validity to survive review."). The record before the Court supports the ALJ's determination that the medical source opinions, i.e., the agency physicians' opinions, were supported by and consistent with the required quantum of record evidence. *See Servin v. Commissioner of Soc. Sec.*, No. 22-cv-01178, 2024 WL 1257350, at *5 (E.D. Cal. Mar. 25, 2024) (finding the ALJ's evaluation of the agency physicians' findings was legally sufficient where the ALJ determined their assessments were supported by their review of the available medical evidence and their disability program knowledge/expertise); *Moreno v. Kijakazi*, No. 20-cv-01503, 2022 WL 2906679, at *12 (E.D. Cal. July 22, 2022) (allowing the findings of the agency were persuasive because they were supported by the agency physician's review of the record and because "state agency consultants are experts in Social Security Disability programs.").

**VII. Conclusion**

The ALJ's decision in this matter regarding disability was reasonable, free of harmful legal error, and supported by the available record evidence, and therefore the ALJ's decision should be affirmed and judgment entered in favor of Defendant.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment. Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. Pursuant to Rule 7.2(e)(3) of the Local Rules of Civil Procedure for the United States District Court

for the District of Arizona, objections to the Report and Recommendation may not exceed ten (10) pages in length. Failure to timely file objections to any factual or legal determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo appellate consideration of the issues. *See United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 8th day of July, 2026.

Camille D. Bibles
United States Magistrate Judge